Good morning, your honors. It's nice to be here today in this beautiful courtroom and as a woodworker, I can certainly appreciate the nice job that's been done here and the taxpayers perhaps in the 1930s, 40s who paid for this building. It's beautiful. When we look at places like this, one of my colleagues says, nothing is too good for the American taxpayers. It is beautiful. It's my first time. I've been here several times. My first time in this courtroom. So may it please the court, Adam Affleck for J. Kevin Byrd, who is a Chapter 7 trustee in Utah. This case involves the trustee's efforts to avoid a $750,000 guarantee obligation incurred by the debtor to a Mr. Len Wardley for the benefit of a company called ABC Club, LLC. The matter before the court involves a single issue in the context of this fraudulent transfer claim and that is concept of reasonably equivalent value and whether the debtor received reasonably equivalent value for the obligation that it incurred to guarantee Mr. Wardley's debt to ABC Club. The trustee moved for summary judgment on this narrow issue. The motion was denied by the bankruptcy court. Bankruptcy court sua sponte granted summary judgment in favor of Wardley, Mr. Wardley on the issue. He had not moved for summary judgment? He did not move for summary judgment. But the court gave him summary judgment. Correct. What's our standard of review in this case? Standard of review is the same as the review standard in any summary judgment case. You have to find that the facts viewed in the light most favorable to the non-moving party or the losing party, because we don't have a non-moving party here, show that as a matter of law, the relief should be granted. And the facts here are undisputed, right? Yes. I mean, obviously, I would say the facts as stated by the parties are undisputed. Some of the facts, I would say that... The facts that are relevant to our legal determination are undisputed. Right, they have to be undisputed. So in deciding a motion for summary judgment, first objective of the court is to determine which of the facts are undisputed and material to the question at hand. Well, but there's a... There are facts and then there are facts. All the historical facts here are undisputed. But there's a question about whether their value was reasonably equivalent. None of you, none of the briefs discuss whether that's a fact or not, but every circuit has said that's a factual issue. It is a fact. Whether it's a reasonably equivalent. It is a fact. How you grant summary judgment on that issue is a real question to me. I don't know that there's any court that's granted summary judgment on that issue. That's for a fact finder. If summary judgment isn't granted here, is it a bench trial or is it a jury trial? It's a bench trial. Okay. But the judge wasn't saying as the fact finder, well, he couldn't in the circumstances. So I just, I can't see... It is how we can affirm this unless you say no reasonable person could find that this wasn't reasonably equivalent value. And that wasn't your... Nobody just, nobody addressed standard of review here. I'm sorry, say that again, Your Honor. Nobody in the briefs addressed the standard of review here. And the standard of review is whether any reasonable person could find that the value was not reasonably equivalent. I think someone could and someone couldn't. That's not, when that's the situation, you can't have summary judgment, can you? I agree. Well, you started the problem by filing for summary judgment. I did. We started the problem. The court denied it, but then decided he would grant it in favor of Mr. Wardley. Well, certainly reasonably equivalent value is fact intensive most of the time. It is fact intensive. I mean, it's fact intensive all of the time, but it doesn't mean that you get to a jury all of the time. So the question is why in this case is the determination of reasonably equivalent value something that cannot be decided on this record? There was no obvious exchange. So Mr. or the debtor in this case, the debtor and Mr. Wardley owned this company, ABC Club. The debtor was a 15% owner. Mr. Wardley was an 82% owner. Mr. Wardley said, I'm not going to loan money to this company unless you guarantee it, debtor. So the debtor guaranteed it. What did the debtor get in return for Mr. Wardley? Trustee's position is absolutely nothing. Now, Mr. Wardley's position is. So you're saying that Mr. White acquired salary, 15% stake incentives. That's nothing? It is not an exchange. It was not an exchange for the guarantee. Sure it was. It was because of the guarantee. That's right. So he gave the guarantee because of this. And that's the question. Well, the issue should be, for example, would any reasonable investor have paid $750,000 committed $750,000 to get with this fellow guy, which is a job he has to work. So you have to discount for the fact that it's put in time that pays him this much, the chance to make so much money. But another investor might not have, might have found this way too speculative that this is going to work. I'm trying to help you. You're fighting it every step. I get it. I get it. I appreciate the help. I appreciate the help. And I will address the issue as the court has given it to me. But I'll lay aside this question of the indirect benefit rule, which I think is something that is very important that has been ignored by the bankruptcy court, the bankruptcy appellate panel. And I think this court should address. But I'll address the question. What, based on Mr. Wardley's arguments, this is what the debtor got in exchange for his guarantee. He got a 15 percent interest in the company. That's worth something, is it not? You can't say as a matter of law that's worthless, can you? Well, if you look at the operating agreement, really the debtor paid for it himself. That's an undisputed fact. He paid $150 for his 15 percent interest. Mr. Wardley paid $820 for his 82 percent interest. In addition, Your Honor, when you look at reasonably equivalent value, you look at the value of the item on the date of the transfer. On the date of the transfer, what was the value of the 15 percent interest in a company that had $1,000 in capital, that had no contracts, no operating assets, that was... That's a good argument with respect to reasonably equivalent value. On the market, that probably wouldn't have sold for very much. But I don't think as a matter of law it's worthless. See, we're arguing... In terms of reasonably equivalent value, you have a good argument, but you're arguing that there's no value whatsoever, which is a legal argument. If he won on those, if nothing he got was a value, legally a value, then you win. Okay. But I don't see how you can say it's of no legal value. Someone might have invested in that. Plus, you need to assess it at the time. You assess reasonable value at the time of the transfer of the obligation. So at the time of the transfer obligation, they all assumed this was going to be a profitable company. So you can't take the facts later, it didn't turn out that way, and then value the company at that point. You've got to take into account what they thought at the time. And there was no reason, based on his experience and the investors' experience, that this wasn't going to be a successful company. What people think cannot be put in a bank account. But that's the date at which you assess the reasonable value. You were assessing it from what happened a year later. Venture capitalists invest a lot because they think this has a great chance of, a decent chance of succeeding. Most of them fail. It doesn't mean that they got nothing in return for their investment, legally nothing. Correct. But that's what you're saying, isn't it? Yeah, it's not a, this isn't an issue. I mean, if you look at it that way, you have to say, well, what was the reality of the party's assumptions? Right. And can you count on them as being accurate? Well, it's based on the evidence at summary judgment. It's not hypothetical. So based on the evidence at summary judgment, there was no evidence presented that suggested the company was doomed from the start, right? Well, okay. This kind of issue was addressed by the court in the RML case. It doesn't matter whether a court in another case addressed the issue. What Judge Rossman's pointing out is you had findings of uncontroverted fact here that were not disputed by either party. Both parties accepted that the court can make this decision at summary judgment because the findings of fact were uncontroverted. So that's appropriate, especially when the court is going to be the trier of fact. So that's appropriate. So you move on. And I guess I don't understand your point. Well, my point is... You did not controvert that at the time the guarantee and the transfers were made, the agreements were made, that anyone thought that this company was not going to be successful. And if they did, why would they be making this effort? Why would the debtor guarantee? But it's not controverted, is my point. We can't speculate now. You did not controvert these facts. Well, the speculation is their speculation. They are speculating that the company will have value in the future. And you... All right, never mind. Now, you asked the question, well, this company wasn't dead on arrival, so it had to have some value. And I agree. But the size of the chance of success is what is the value, not simply that there is a chance of success. You can't say, well, there's a chance I'll buy stock in this company for $100,000 because there's a chance of success. It is the size of the chance of success that renders it reasonably equivalent value or not. And here, it's not an undisputed fact that the size of the success is equal or reasonably equivalent to $750,000. Can I ask you a question about your argument that...about the payment of the guarantee that Mr. White had not received reasonably equivalent value for paying the $750,000? It's a separate issue, right? Talking about the...yes, it is a separate issue. And so the payment here was literally dollar for dollar. So I just want to make sure I understand your argument. So the only way that this could not be reasonably equivalent value is if the promise to pay was conditional. Is that a correct way to understand your argument? Contingent, but yes.  Yeah. And can you point us to how the promise here is anything but unconditional? I'm having trouble understanding that component of your argument. Yes, it's at Appendix 895. It is the operating agreement which contains the language of the guarantee. It says this is an irrevocable and unconditional promise to pay. Yes, this is the... Am I reading the correct language? I'm not sure what you're looking at. It's the language in the guarantee itself. That's the guarantee itself, yeah. It says this is in... So the language of the guarantee says, Mr. White personally guarantees the payment of the full amount of Mr. Wardley's loans up to $750,000, such that to the extent the company's cash distributions to Mr. Wardley during the first 12 months of the company's operation, commencing with the first commercial shipment of cards, do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. So if you... It's not a bad sentence. It's not a great sentence. But it means that the guarantee is not owed until 12 months after the first commercial shipment of cards by the company. And the amount that is owed on the guarantee is the difference between the distributions that Mr. Wardley receives from the company and the amount that he has loaned. That is a contingent... makes it a contingent obligation. It's contingent on the company actually... Why isn't a better or correct way to read it that Mr. White is liable on the full amount no matter what, but if these things that you just read happen, this is how we calculate what he owes? Because ABC will have presumably paid some of it off. I mean, it really goes to the method of calculation, not a contingency surrounding the obligation to pay. Well, it says after the company ships commercially 12 months, got 12 months of operation. And during that 12 months of operation, I'm sure the debtor thought the company would make millions of dollars and pay Mr. Wardley back everything he had loaned. But if there was a shortfall, then he would owe on the guarantee. Now... Your time has expired. Thank you, Your Honor. No, thank you. Any questions? Thank you. Thank you. Good morning, Troy. I remember on behalf of Lynn Wardley, the appellee, I want to make sure that the... I'm sorry, Your Honor. I was going to ask a question, but I think you may be answering it. So go ahead. Well, I don't know if I'm going to answer it or not, but now I'm going to try. Don't try to read Judge Hartz's mind. That's probably the problem. I'm not very good at mind reading anywhere. So maybe instead of starting with that, I'm going to just start with an interchange that you had with the trustee on essentially why would any reasonable investor have given this guarantee? And I want to make sure that we're... That was not my question, actually. I'm a poor mind reader. No, no, no, no. Maybe I expressed it that way. That was not what I was thinking. I couldn't read my mind. Well, that was certainly... Let me go ahead and ask the question. Please do. You did not move for summary judgment? Your Honor, we've moved... There were, I think, four summary judgment motions that were made before the bankruptcy court. We made one of them. We had cross motions essentially in every one of these motions for summary judgment. If we didn't move on the particular issue of whether the guarantee itself, not the payment of the $750,000 that Judge Rossman was asking about, but the guarantee itself was for lack of reasonably equivalent value, I think we did that on cross motion based on the trustee's motion, who I believe was trying to carry some sort of burden that he had that there was a lack of direct benefit under the Jolly case. He failed to carry that burden before the bankruptcy court. And it's only when you carry that burden as the plaintiff that you then get into this realm of, well, if there's no direct benefit, let's talk about what possibly could be the indirect benefit that was given as part of this transaction. Go ahead. No, please. Your questions are certainly going to be more important than mine. Okay. So the parties agreed on the facts, the historical facts, what happened, what was signed, what was shipped, what was paid, all that stuff. Is that correct?  Okay. So the only issue was reasonable equivalent value. Is that right? Well, sure. But it's a little bit more nuanced than that, Judge. And the reason for that is if you are looking at what does the trustee really want out of this case? The trustee doesn't want to set aside a guarantee. The trustee wants to find a creative way to say that the $750,000 that was paid to Mr. Wardley on account of a fully secured guarantee that has all of the language that we just read, that it's irrevocable, it's not contingent, it is, well, it doesn't say non-contingent. I don't think it says it's unconditional, it's irrevocable. There are many shalls in the guarantee language that despite that fact, there must be some reason that we can set this $750,000 payment aside. And the theory that the trustee came up with, using now hindsight nine months into the future from the time that Mr. Wardley and the debtor entered into this deal, was, well, look, nine months down the road, this doesn't look like it was that great of a deal. It doesn't look like that was that great of an investment. That venture capitalist lost his or her investment. And it started this creative way to look backwards from a dollar-for-dollar exchange to the first step, can we make this somehow contingent? And the bankruptcy court said no. The only way you can set something aside because you didn't get reasonable equivalent value is if you're, oh, shoot, the word escape. Like an insider or if there's actual fraud. I'm not, I'm guessing. Underwater to start with, what's the term? You're insolvent to start with, is that right? Correct. So if, did the trustee say that Mr. White was insolvent when he entered into this agreement and that he did not get reasonably equivalent value at that time and therefore the money he's paying was not for reasonably equivalent value, he was insolvent and we can revoke that. Was that the theory? That's the theory and that's the allegation. As an aside, the issue of insolvency has never been determined by the court below because we didn't get to insolvency because the court knocked it out on there was a dollar-for-dollar exchange of value. But there wasn't at the time the agreement was, what if, okay, you're insolvent, let's consider what could be a bothersome situation. It might not be what happened here. Mr. White is insolvent. He says the only way I'm going to get out of this is if I can make this company go. So I'm going to put all my eggs in that basket. I'll promise to pay up to $750,000 if Mr. Wardley puts money in this company. Nobody else would probably invest in this company. It's too speculative. So what I'm doing, no other, no reasonable, or there are reasonable people would say it's not worth anything like the money he's guaranteeing. So he does that. The creditors of Mr. White could be very upset with that. We shouldn't pay for him being able to speculate on, he could have gone to Vegas and speculated. And he's not allowed to spend that $750,000. That was a fraudulent transfer under the statute. So in that circumstance, I would think the trustee could set something aside. If in fact he got reasonably equivalent value for this $750,000 promise, then everything's kosher. Right. So the bottom line to me seems to be, was this original deal a transaction for reasonably equivalent value? That's a factual issue. That is not a legal issue for a judge to decide unless there's no value. And he seems to be arguing there was no value. But aside from that, it's a factual issue and it wasn't treated as a factual issue. Well, so there's a bit to unpack there, Judge Hartz. But let me start with this. First, as it relates to the facts, you're absolutely right that the trustee came up, at least during the bankruptcy court level, with no facts to contradict the 10 or so categories of benefits that Mr. Wardley pointed to as undisputed fact. Can I ask you just a question about what you just said? But they weren't quantified, right? Correct. Well, it depends. One of them was certainly quantified in terms of the 20,000, well, maybe a couple of them. One of them was certainly quantified, the $20,000 a month payment that both White and Wardley considered Wardley to be loaning to White for the use of the ABC Club. So in terms of quantification at the time that they reached the deal, and there's an important point here because we've got to talk in a moment, hopefully, about what was actually exchanged for the value of the guarantee at the time of the transaction in December. But to answer your question, yes, there was quantifiable benefits, $20,000 a month that would be used for whatever purpose. It was the debtor's money that was coming from Wardley that he could use for whatever purpose. The other, I mentioned at least two categories. The other category of quantifiable was the 15% ownership stake in the company. Now, granted, what was the company worth on the day of formation? Who knows? I mean, it's- So should we say the same thing about the 15% stake? Does that count as a benefit if we don't have a point of departure from which to assess what it could be worth? We certainly have a point of departure. And I would say, first of all, you can certainly take, for reasonably equivalent value purposes, the value in a speculative company. Those are my terms, not necessarily the court's. That RML case is on point for that very issue. The Third Circuit said that that's not a problem. In fact, it happens all the time. If we didn't do that, we would be discouraging investors like venture capitalists to take a shot at something. Well, we do want to discourage insolvent people from defeating the opportunity of creditors to collect by spending the money they have in a speculative venture that the insolvent person hopes will get them out of the hole, but may well make the creditors, harm the creditors. I agree, Your Honor. But let's talk about what it is that Mr. White, they both start with W, so sometimes, the debtor, that the debtor was giving up in December when he gave the guarantee. At the time he gave the guarantee, no loans had been made. There wasn't anything that he had to actually stand for. So we keep talking, on the one hand, about the speculative value or the pie in the sky, millions of dollars in this medical card business that these two individuals thought that they were going to earn. But on the date of the transfer, which is when you look at reasonably equivalent value. He owed nothing under the guarantee. He owed nothing under the guarantee at all. Don't you look at the whole transaction, though, to see what it is? Because he ends up having to pay $750,000. Correct. That's the end of the transaction that the court has said there was a dollar-for-dollar exchange. So at the end of this transaction, what Mr. White had done is pay off a $750,000 secured guarantee obligation. He gave dollar-for-dollar credit. That's true. To your point, Your Honor, his creditors wouldn't be harmed at all because if the creditors came calling, Mr. White could say, well, wait a second. I'm sorry, Mr. Wortley. I told you how to do it. Mr. Wortley said, just wait a second here. I have a fully secured interest in this judgment that the debtor was going to obtain. He pledged it to me to help induce me to make these loans. And I'm just coming to call. Yeah, but the challenge is whether he got value for that guarantee. Correct. And that's my point, Your Honor, for making sure that we focus on what was being exchanged. We hear the trustees say, well, this was doomed from the start, although he had no evidence for that at the trial level. But he says, look, this was doomed from the start. It was pie in the sky. It's millions of dollars. They should have known that it wouldn't work out that way. Well, what did the debtor actually exchange at the time? He had a guarantee of potential future liability if Mr. Wortley made these loans. So in terms of the overall impact to his creditor body, if someone sued him on the date of the guarantee, I mean, it's kind of no harm, no foul. It's like, hey, I gave this guarantee, but there isn't anything to be paid here. So hopefully that helps. Well, so on the doomed from the start, which is, I think, what he's suggesting now is that it didn't have the value that Mr. Wortley apparently thought it did. But there is no evidence, and no evidence was presented from the trustee regarding that aspect, that this was somehow doomed from the start, that this was a bad deal, that it clearly wasn't going anywhere. Was there any evidence presented of that? No, the short answer is no. I mean, what really happened here was for some period of time, the debtor had been trying to convince Mr. Wortley to come to the table, make some investments, get into business together, and they were slicing and dicing in different ways. The answer repeatedly from Mr. Wortley was no. I'm sure, if we want to keep using hindsight, being 2020, he wishes it would have always been no because he ended up losing, he ended up getting paid back his $750,000, but he invested a lot more than the $750,000 that he lost. So the answer was no. But as to the kind of the speculative nature, I would just want to make sure that the court understands and appreciates that there are cases, gambling cases, the Chamakos case, the Hanover case, which I think was some sort of Jimmy Swaggart Fifth Circuit case, so there might even be other elements that we don't typically think of as pure exchanges of value. They go into the mix at the beginning of a relationship such that it's not so crazy to give things like guarantees if you're going to make millions of dollars with one another. How should we be thinking about the direct, indirect benefit burden shifting here that the appellant is discussing with us? Your client only wrote checks to ABC, right? Correct. So why is that not literally the factual predicate for what we would take to be an indirect benefit? Right, I would invite the court to look at the record and what was actually before the trial court, what was before the trial court was both of these parties undoubtedly, Mr. Wardley and the debtor, treated these loans as loans from Mr. Wardley to the debtor. And there are no, there's no disputed fact, there's no disputed facts that take issue with that. There are no- Well, it wasn't direct. I mean, it went through ABC, right? So we would have to agree with the bankruptcy court that that, you know, this is just form over substance. And that's what you're asking us to do, right? Correct, and I would also add, take a look at the Rubin case that was cited by the trustee. There's language, I think it's a Second Circuit case that discusses the fact that even if the payments went to the entity, if it was just a mere conduit to get to someone else, it's still reasonably equivalent value, it's still benefit. I'm out of time. Thank you, counsel. Thank you. Case is submitted. Thank you. Counselor, excused.